#### TELFORD *v.* BARNEY.[1]

LANDS not under Indian government, but held by individual Indians as tenants in common, are subject to the jurisdiction of the state or territory in which they lie.

The Half-Breed Tract, after Congress released the reversion to the half-breeds, became subject to the jurisdiction of Iowa; and the partition made in 1841 by the territorial court, is valid, and is conclusive evidence against all persons, of legal title in those to whom the shares were allotted.

Partition under the act of 1839, is not the severance of an actual possession, but of the title in the abstract, and binds the parties by estoppel, and 'proves title *prima facie* against strangers.

A court of general jurisdiction is one which has the powers that are not withheld, and a cause not shown by the record to be out of its jurisdiction, is presumed to have been within it.

A court of special jurisdiction is one which has only the powers conferred, and a cause is presumed to have been out of its jurisdiction, which is not shown by the record to be within it.

If, by presumption or averment, the cause appears to be one which the court had power to decide, the decision, however illegal, is valid until reversed, and those on whom it professes to operate, are presumed to have had due notice by writ or publication, unless the contrary appears.

---

(1) This case was reported by a member of the bar in Lee county; and is inserted as an appendix to this volume, by request of several members of the profession.

Telford *v.* Barney.

The probate of a will on the testimony of one witness, whilst the statute requires two, is valid until reversed.

A judgment assented to is not a mere contract *in pais*, especially if consent be merely superadded to actual adjudication.

Uncertainty in pleading is cured by a certain judgment, if the allegations open the door to the necessary proof.

A trustee of the legal title may convey by agent, though an agent to convey title held by another, must act in person.

The statute does not dispense with proof of an agent's power to convey land.

Title under a fraudulent judgment is good to an innocent purchaser.

Can a judgment be impeached collaterally for fraud? Not in Iowa since *Webster* v. *Reid*, 1 Iowa R. 467.

The decisions of the territorial Supreme Court, are binding on the District Courts of the State.

This was an action of right, (ejectment,) for 160 acres of land, parcel of the "Half-Breed Tract."

The Sac and Fox Indians ceded to the United States in 1824, "all their lands in Missouri," by metes and bounds which included a small tract in Iowa between the Mississippi and Des Moines rivers, "it being understood that the small tract between the rivers, &c., is intended for the use of the half-breeds, &c., to be held by them as other Indian lands are held."

In 1832 the Sacs and Foxes ceded their lands in Iowa adjoining the tract, and removed west. In 1834 Congress relinquished the reversion in the tract to the half-breeds, "with full power and authority to transfer their portions thereof by sale, devise, or descent, according to the laws of the state of Missouri.

In 1841 the tract was partitioned by this court, and this lot was set off to.Marsh Lee and Delevan, who conveyed to the plaintiff's testator.

The statute under which the partition was made, is sufficiently set out in the opinion of the court. The record of the petition is very voluminous, and shows the following facts:—Josiah Spalding and others filed their petition, representing "that they have a legal title to, and are seized in fee

simple of, twenty-three and one-third full shares, and 5135 acres of land in that tract commonly called the "Half-Breed Tract," situate, &c., bounded, &c., and containing one hundred and nineteen thousand acres, more or less, together with one full share and one-sixth of a share in Keokuk, a village situate on said tract;—the particular interests here claimed are as follows: J. S. claims one-half of a full share under Margaret Antaya, a half-breed, &c.,"—defining the claim of each, and its derivation, " and that Euphrosine Antaya," and others by name, " their heirs and assigns, and other persons whose names and places of residence are unknown to your petitioners, are tenants in common with your petitioners in said premises." The petition was sworn to by the plaintiff's attorney, as true to the best of his knowledge and belief.

A summons to the defendants named was returned "not found," and "notice as the law directs" was ordered, and was published in one paper twelve weeks, at Burlington; "that a petition was filed on &c., by &c., against &c., and is now pending, wherein the petitioners pray that partition be made of the following real estate, &c., and the said defendants, *and all other persons interested in the said property*, are requested to appear and answer said petition, on, &c., or the proceedings had in the cause thereafter, will be binding and conclusive on them forever." The defendants named, except Euphrosine Antaya, and others not named, came in and answered, setting forth their titles, and *by consent*, the court, without a jury, tried the cause, and being *satisfied by sufficient proof* that the publications required by the act had been duly made, and no other persons appearing or making any claim or objection, and *the claims, proofs and conveyances of all the parties being heard and considered*, adjudged, *by virtue of its authority under the statute, and with the consent of the parties*, that the shares were one hundred and one, that Marsh Lee and Delevan, trustees, &c., under articles, &c., exhibited with their answers, were entitled to forty-one shares, &c., defining the rights of the parties. Partition was ordered to be made accordingly, upon

37

the basis of a *plat agreed on by the parties,* and it was de-clared that all other persons were barred from claiming title in the lands. The *partitioners departed from the plat* where that departed from the truth, and divided the land as they found it on the ground, including islands not on the plat.

The report was confirmed upon argument, an error in the number of shares being corrected *by consent,* and the shares were allotted by ballot, and the partition and allotment were adjudged and decreed to be firm and effectual forever.

The plaintiff having read the treaty of 1824, and the act of 1834, offered the record of the partition. The defendant objected, that,

1. The court had not jurisdiction to make the partition.

2. It is not evidence against the defendant, a stranger.

3. It is not evidence of legal title.

These, and some incidental questions, were argued at great length by *J. C. Hall* and *Cyrus Walker* for the plain-tiff, and *George C. Dixon* for the defendant.

By THE COURT. On the question of jurisdiction, several points have been made. The first is, that this was *Indian* land, on which the court could not exercise its power to make partition.

The argument is that, by the treaty the half-breeds had the right of possession and governmental jurisdiction, and the act of release added the fee and the right of alienation ; that there is no evidence that they had aliened when this partition was made ; and that, had they done so, any or all of them, jurisdiction. remained though title departed from them, and therefore, without regard to title, the land was Indian land.

Indian land possesses no intrinsic quality, distinguishing it from *domesticated* land, and enabling it to repel the juris-diction of civilized people. An Indian tribe, or other politi-cal community or nation, cannot, on becoming extinct, or on abandoning its territory, leave behind it, adhering to the land, a thing called *jurisdiction,* capable of excluding other

jurisdictions from the vacant territory. Much less could this be effected by an *imaginary* tribe, having no existence *in* fact.

This tract was within the territory of Iowa, and unless jurisdiction of it actually belonged to some other existing political community, it belonged to Iowa. The right to govern it was not in the Sacs and Foxes. They had parted with that right by the treaty of cession. By that treaty they ceded all their lands in Missouri, embraced in specified limits. If it be said this land was not in Missouri, the answer is, the metes and bounds included it, and these must prevail. It was not *reserved* for the use of the half-breeds, but *granted* for their use. The Indians say to the United States, we give you so much land—this for you, that for the half-breeds. They parted with all their rights—possessory title and political jurisdiction. The right to occupy went to the half-breeds. The right to govern went somewhere, either to them or to the United States. It could not go to the half-breeds unless they were, or should become a political community. That they *might*, by assuming that character, have clothed themselves with jurisdiction of their territory is not material, unless they really assumed that character. It is not material what answer the treaty alone would give to the question of jurisdiction, for it does not stand alone. Ten years after, when the Indians had ceded their contiguous lands, and with them had migrated many of the half-breeds, leaving a few females who had married white men, and a few drunken vagrants to annoy the whites, who were beginning to occupy the tract as well as the ceded land, and when no semblance of a half-breed community existed, or could be constructed of the remaining materials, Congress, in view of these circumstances, released to them the fee in reversion and the right of pre-emption, severed their joint tenancy, invested them individually, their heirs and assigns, as tenants in common, with the allodial fee simple, and prescribed the rules of alienation and descent, instead of leaving that matter to their own municipal regulations. The intent of congress to place

this land on a footing with other lands to which the Indian title and sovereignty had been extinguished, could hardly be made more manifest by express words.    The act treats the half-breeds, not as a people competent to govern, but as natural persons, subject to our national government.    They needed laws and congress gave them laws, expecting the land, by operation of these laws, to find its way into the common mass of real estates, thus discountenancing every idea of Indian jurisdiction.    When this partition was made there was not, and at no time since the treaty had been, an existing tribe to govern the tract; the materials for constructing such a tribe were hopelessly scattered and lost; congress, in whom was the sovereign power, had declared them mere individuals, requiring other law-givers than themselves; the land had lost its distinguishing marks, and Wisconsin and Iowa successively had exercised over it legislation, adjudication, and administration, without question or doubt of right; it was occupied by whites, who had mostly possessed themselves of the titles in common tenancy, and had spotted it over with farms and villages, and had done and suffered such innumerable acts of civil and criminal jurisdiction as if now held void, would bring upon a community of thousands, chaos of rights and ruinous calamities.    And to what good? To protect from wrongful encroachment the rightful jurisdiction of a political community which never existed, and whose future existence had been in effect prohibited by Congress, and had ceased to be possible in fact.    But how do we know these facts?    The court knows the territorial limits of its own jurisdiction, and if deforced from a part of its county so pre-occupied, it will look into the current history for the facts which work the exclusion.

Stress is laid upon the fact, that the act of release authorized transfers of title according to the laws of Missouri. It is urged that if congress designed the land to fall under the jurisdiction of the territory of Michigan, since Wisconsin, finally Iowa, it would have left it to the operation of the laws of that territory.    The officers and organized

Telford *v.* Barney.

counties of Missouri were probably most accessible; but whatever may have occasioned this singular provision, its terms can be satisfied by treating it as a personal privilege to the half-breeds, instead of a permanent incident to the land. So applied, it may have been a convenient, and is now a harmless provision, and loses its force as an argument against our jurisdiction.

The practical exposition of this subject by the several governments and by the community, received the sanction of the Supreme Court, in *Webster* v. *Reid*, 1 Iowa R. 467, and whatever view this court might have taken of the merits of the question, which have been examined out of respect to counsel who have labored it so confidently, that case must have furnished the law for this.

But it was not enough that the land could be partitioned. The court must have been called upon by *a case presented* to exert its partitioning power; for it could not undertake the business upon its own motion. It is said that no such case was made, and that the proceedings were *coram non judice* and void.

The petition described the land with certainty, averred that the parties owned it in common, and asked to have it divided among them, the parties came into court, brought in the subject matter, and asked the court to act, and the court acted. It matters not that it should have acted otherwise. Had it power to act at all? Could it have sustained a demurrer to the petition and given judgment for the defendants? This cannot be doubted And this power is jurisdiction of the *case.* The petition truly was uncertain in that it did not give the *ratio* of each plaintiff's interest to the whole, and each defandant's also, or aver ignorance of it. But if demurred to, it might have been amended to more particularity, or to some excuse for its absence. The door was open to all evidence of title that could be found. Perhaps it appeared upon the trial that

Telford *v.* Barney.

the half-breeds were scattered among the Indians and whites, and could not be traced in their wanderings nor identified when found; that after the act of release they were sought by sharpers and induced to convey many times in succession, and these titles, good and bad, were hawked about, and fell into the hands of non-residents, until confusion had become so utterly confounded, that how many, and who were owners, and what were their relative rights, baffled human means to ascertain. From all the light the court could get it found the number of half-breeds to have been one hundred and one when their joint estate was severed and made a tenancy in common, and that these one hundred and one shares had become and were the property of the persons named in the judgment, in the ratios there stated; and this finding reduced the matter to certainty, and closed the door against objection on that ground. Who shall be deemed parties to the judgment is not now the inquiry. There *were* parties before the court, and the land was divided among them. Is the judgment valid as to them, and evidence of title in them until other owners shall be found?

And, first, is it good between the parties? May those who came in and took land by the judgment rebel against it as a nullity and disturb each other without resorting to a writ of error? To state the question is to answer it.

The second question is hardly more difficult. It is evidence of *title*.

Joint tenants and tenants in common, *entitled* to possession, may have partition. Seizin in fact, or, at the least, freedom from adverse possession, necessary at the common law to support the writ of partition, or to authorize partition under the New York act of 1813, (9 Cow. R. 530,) is not necessary under our statute. Neither is the judgment followed by a writ of possession, but the several owners, if deforced from their separate parcels, must bring possessory actions. How, then, is it the mere severance of an actual

Telford *v.* Barney.

possession, when possession is neither a requisite nor result? Title is the basis of the action. The right of partition and right of entry are alike the offspring and coincidents of title, and alike are barred in defence by the statute of limitations. Title being the question, both plaintiffs and defendants are required to exhibit their *proofs* of title, though not denied, and to file their title deeds or exemplifications of them, and unless these establish title they cannot have partition. If partition is ordered, made, reported, and confirmed, "judgment shall thereon be rendered that such partition shall be firm and effectual forever." Partition of *what*, if not of the *title in the abstract*, which alone was involved in the inquiry? If all parties interested are summoned, or notified by publication, this judgment shall be binding and conclusive upon all persons whatsoever. Conclusive of *what*, if not of the *title* which alone was partitioned? If not susceptible of division without injury, the property is sold and the money divided, and all are barred who were summoned or notified. Barred of what, if not from claiming title against the conveyance? It is declared to supersede and abolish the writ of partition and the bill for partition, and is to be proceeded in as a personal action and reviewed on a writ of error. It is a statutory action *sui generis*—a personal action of law with chancery powers— resembling the proceedings by libel and answer, under the civil law, more nearly than anything known at Westminster, and may be called the *action of partition*. It gathers up, and binds as with a band, all prior titles, and becomes the radiating point of all subsequent titles. Behind it no investigation can be had by those who were summoned or notified. It is not a severance of *possession*, but an adjudication upon the *title*, ascertaining, and declaring by record evidence, that here is the title and its incidents seizin in law. The litigation is not *exclusively* between the *parties*, but the court, the *government*, the public, is a party to it. Every claimant must make his proof to the

*court*, which is required to *inspect* his title papers, and send him away empty if *they* are not sufficient, though the other claimants should not object, but consent to let him in. The judgment is not only adversary, as between the parties, and binding by estoppel, but as to third persons it is *prima facie* evidence of truth in the nature of a public declaration of the government upon an ex officio examination of the facts.

It is not of itself *title*, but *evidence* of title working a bar by estoppel against the parties, and subject, like other evidence *not* working by estoppel, to be rebutted by strangers to the record, by proof that the title is somewhere else; and, as such evidence—*prima facie* or conclusive—it will sustain or defeat an ejectment.

This is a question of construction, arising on the statute, and is aided by authority only so far as like decisions have been made upon similar statutes, as *Clapp* v. *Bromagham*, 9 Cow. R. 530, 569, and other cases after cited.

Counsel have labored the question whether unknown owners who did not appear, are estopped by the record. That question can only arise when the defendant offers evidence to connect himself with the title behind the record. As the court has been advised that such evidence will be offered, and the question has been elaborately argued with that view, it will be disposed of at this time.

Was this a proper case for publication of notice, and was notice duly published?

The defendant argues that in making partition, or at least in charging unknown owners with constructive notice, the court had but a special statutory authority, to proceed in a specified manner, upon specified precedent conditions, and nothing will be presumed which does not appear; and that the affidavit and publication, as shown by the record, which precludes the presumption of better, are not sufficient to charge those who did not appear, as *parties confessing by default*.

The plaintiff insists that a judgment disposing of all the land, and professing, in terms, to bar all other claimants, pre-

Telford *v.* Barney.

supposes that the court had given all, known and unknown; for the petition shows there were owners of both classes, an opportunity to assert their rights—presupposes due notice to the world, which need not therefore be spread upon the record; that, therefore, if what appears is insufficient, it must be presumed to have been aided by other proof not stated; and, if not so aided, nor good without such aid, it was held sufficient by the court, and that decision, though clearly against law, is conclusive until reversed.

The first objection is to the affidavit, that it should have been made by the plaintiffs, or by some of them. The petition "shall be verified by affidavit," and shall set out the interests of all the owners, known and unknown, or aver ignorance of those not set out. If it be intended that the *parties* shall swear to the petition, to hold it otherwise good would be at most but error. It is customary in our legislation, when a party, or other person in particular is to swear, so to require expressly; and customary with our courts when it is not so expressed, to hold an affidavit sufficient if made by any one who knows the facts. The attorney who investigates the titles and prepares the petition, must, as a general rule, be better qualified than any other to swear to it; and this was peculiarly so in the present instance. As to its being of *belief* only, the nature of the case was such that no one but a half-breed could swear to his *own* title, much less to the titles of others. But under our statute the affidavit is not the foundation of an order of publication, but is a requisite formality to the commencement of the suit, against persons either known or unknown. And, "if the petitioners believe it at all probable that there may be joint owners not known and not named in the petition," or if any defendant named cannot be found, the court may, *on their application*, order notice. The affidavit goes to the formality of the *petition*, and is waived by answering. It is not a condition precedent to an order of publication—*that* is obtained by *applying*, not by swearing.

It is next objected that the notice was published in one

paper only, and that perhaps not the nearest, and only twelve weeks, whilst the statute requires twelve in the nearest, and four at the seat of government. The twelve and four, however, are not accumulations of *time*, but designations of the *number of insertions*, which may be contemporaneous. And as to the number of *papers*, that depended on extrinsic facts. Perhaps there was no other nearer or in the territory. It could hardly be necessary to establish newspapers, in order to duplicate the publication.

The sufficiency of the petition, of the affidavit, and of the publication, were questions necessarily before the court for its adjudication; and the court adjudged that the petition presented the case in proper form, that it was a proper case for notice, and that notice was properly published. That court was then more competent to a correct decision of these questions, than this court can now be. Right or wrong they are judicial decisions—decisions on matters *coram judice*—on questions properly before the court—and can only be examined on writ of error.

An examination of a few of the cases which most resemble this, will strengthen this conclusion.

In *Denning* v. *Corwin*, 11 Wend. R. 467, partition had been made, and a tract assigned to unknown owners, and sold to pay their share of the costs, on execution, to a stranger, and by him conveyed to the plaintiff in partition. To an ejectment by the unknown owners, the partition and sale were opposed in defence; but the plaintiff in ejectment prevailed, on the ground that he was not a party to that partition. The statute authorized the court, not on *application*, but on *affidavit* that the owners were unknown, to order notice. The record was silent as to affidavit, and, it seems, as to publication, for Chief Justice Savage asked, " Should not the record show that it had been made to appear to the court by affidavit, that the owners were unknown to the plaintiffs, and that such notice had actually been given?" *Gallatian* v. *Cunningham*, 8 Cow. R. 370, was cited in argument, that when a statute requires proof preliminary to an order,

Telford *v.* Burney.

and *defective* proof is given, it is error; but if *no* proof is given, the matter is *coram non judice*, and the order void. Therefore, as there was no affidavit made, or notice given, the partition was held inoperative against the unknown owners. *Non constat*, had there been in the record a defective affidavit and defective proof of notice, the unknown owners seeking their rights, would have been sent to a court of error.

If it could be established then, that the affidavit to the truth of the petition, under our statute, is a condition precedent to the order of publication, and that the affidavit set forth in the record, and the proof of publication, are defective, *Denning* v. *Corwin* would prove the partition not void, but erroneous, as to the unknown owners.

In *Foote* v. *Stevens*, 17 Wend. R. 483, Judge Cowen laid down the rule which the plaintiff claims for this case, that the parties against whom judgment is given shall be presumed to have been regularly brought in, unless the contrary expressly appears, and he avoided denying the authority of *Denning* v. *Corwin* by saying that, in making partition against unknown owners, the court acted upon a special statutory authority, and not as a court of general jurisdiction. In *Hart* v. *Seixas*, 21 Wend. R. 40, Judge Bronson seems to regard *Denning* v. *Corwin* incorrect in holding the partition void rather than erroneous. But in citing it again, in *Bloom* v. *Burdick*, 1 Hill R. 130, he appears, like Cowen, to place it on the ground of limited jurisdiction.

In the case last mentioned, the plaintiff in ejectment proved title, and the defendant offered as evidence of title in himself, certain probate proceedings, by which the land was sold to pay the debts of the plaintiff's ancestor. The plaintiff attacked the sale by proof that he was an infant, and no guardian was appointed for him to show cause against the sale.

The court held that, under the statute, the infant could be brought in only by guardian, and the want of a guardian expressly appearing, the door was closed against presumption. It was not a case of presumptive jurisdiction of the person.

but of established want of jurisdiction, which would avoid any record of any court.

*Cole* v. *Hall*, 2 Hill R. 625, was like *Denning* v. *Corwin*, an ejectment, in which the plaintiff proved title and rested. The defendant then offered the record of a partition against unknown owners, and a sheriff's sale of the unknown owners, several part to his own grantor to pay costs of partition. Objection was taken that, " no *proper* affidavit was made nor *any* notice published." Cowen, Judge, overruling the objection, said, " Here was jurisdiction and a judgment, —such matters cannot be inquired into collaterally." The court held that the record need not speak by *averment*, but it should be *presumed* that a proper affidavit was made and notice duly published, and gave judgment for the defendant on his sheriff's deed. It would seem that there was an affidavit of some sort, but not a " proper" one, and so far it is consistent with *Denning* v. *Corwin*. But there was *no* evidence of *notice* save the presumption, arising from the fact that the court gave judgment for partition and costs against the unknown owners.

Can *Cole* v. *Hall* and *Denning* v. *Corwin* both be right? The latter went on the want of affidavit—perhaps notice was actually published, for no objection was raised on that point. Notice is the writ,—substituted because process cannot be served. The defendant cannot be put off with less, the affidavit proves he could have no more. Can one record be void because it does not show the defendant's right reduced to the minimum, and another valid which does not show that even that was granted him? Is a party, whose rights have been adjudicated without notice, benefitted by learning from the record the means by which he should have been informed? What matter as to the *kind* of writ if *none* were used? Yet the former case held a record void because it did not show that publication was the proper writ, and the latter held another valid which did not show that this or any other was in fact employed. The former had been often questioned and evaded, by the latter it was disregarded,—perhaps overlooked.

Its utmost influence can only hold the question open in that state, whether silence as to affidavit, or notice, or both, converts the record into a nullity.

*Voohres* v. *Bank U. S.*, 10 Pet. R. 449, was ejectment on title derived through sale on attachment, defended against for want of affidavit and publication of notice. The court, per Baldwin, Judge, admitted that these did not appear of record, and that they were conditions precedent to the condemnation of the land, but held the record valid and the title good, on the ground that the court having had power to condemn land of absent debtors, affidavit of non-residence and publication of notice should be presumed. Counsel pressed upon the court the distinction suggested by Judge Cowen, as a means of supporting *Denning* v. *Corwin*, that this was a harsh summary proceeding to condemn a party unheard, in which the court had only special powers, particularly defined by statute to be exercised against common law and common right, on certain specified precedent conditions, and therefore the court had *quoad hoc*, but a special and limited jurisdiction. The court took no notice of the distinction, but placed all *judicial* acts of a court of *general* jurisdiction on the same footing as to the presumption of jurisdiction facts when *collaterally* questioned. This is the tone of all the cases in that court, from *Kemp* v. *Kennedy*, 5 Cranch R. 173, down to *Grignon* v. *Astor*, 2 Howard R. 319, and is not only the most reasonable doctrine, but the one best supported by the decisions of the leading courts in this country and in England, as appears by the cases cited at the bar, and not necessary here to be further reviewed.

But in this record there is more than silence, there is an affidavit, either good or bad; if affidavit be the basis of notice and publication, with which the court was satisfied by sufficient proof. If no more proof than appears can be presumed, and that be insufficient to authorize the judgment, the court should have decided otherwise than it did, but still had *power to decide*. That power,—the power to have decided the other way,—is jurisdiction of the question then be-

fore the court, as to the sufficiency of the affidavit and no-
tice. If the exercise of that jurisdiction produced the wrong
result, that result is none the less a judgment for being er-
roneous.

If the partitioners did not pursue the judgment, *Shriver*
v. *Lynn*, 2 How. R. 43, does not prove the judgment of con-
firmation void, for here the cause and the parties were still
before the court, whilst there the cause had been disposed of
and the parties dismissed. Finally it is agreed that this
judgment was the offspring, not of judicial inquiry, but of
the mutual consent of the parties, and this fact appearing, a
court of law must see it, and treat the record as a contract
in *pais*—a deed of mutual releases, possessing no efficacy as
evidence against strangers, without proof of anterior title.

Had the record shown unequivocally that the court did *not*
inquire, but that the parties settled by agreement the facts
and resulting rights, and the judgment was recorded as a
merely *clerical* act, it might have become necessary to de-
cide the question presented. But the record avers that " the
claims of the parties, and their respective proofs and convey-
ances being by the court heard and considered," it was, "by
the consideration of the court, by virtue of its authority un-
der the statute, *and* with the consent of the parties," ad-
judged. The court *did* inquire, and *did* find the facts, and
*did* settle the rights, and *did* award the land according to
the rights resulting from the facts found by the inquiry. The
" and with" *professes* but to *add* consent to *judicial decision.*
If it operates to waive error, as to those consenting, that is
the limit of its power. It detracts nothing from the efficacy
of the work wrought by the active exercise of the judicial
mind. For the judgment of confirmation, consent alone
might have sufficed, for none but those consenting could be
affected : the rights being fixed, others could have no interest
in the mode of actual division. Yet even that judgment
came from the mind of the court after argument *pro* and *con.*
The remaining consents went to the waiving of a jury to try
the titles, which the statute permits, and to the correction of

a mistake in the number of shares, and perhaps to other matters of mere proceedings. Therefore, it is held,

1. That the power of the court to make partition could be exerted on this land.

2. That this jurisdiction actually attached by means of a proper case.

3. That the judgment is adversary and evidence of a legal title.

4. That all persons were made parties and are estopped by the record.

The plaintiff having read the record, offered the deed of Marsh, Lee and Delevan, made by the agent. The defendant objected that the agent's power must first be proved. The plaintiff insisted that the deed, being acknowledged and recorded, might be read "without further proof," under the statute of conveyances, Sec. 34. The court sustained the objection, remarking that the officer merely certified, that the claiming to act for the grantor acknowledged the execution. He is not made judge of the supposed agent's authority, and if no proof of such authority is now to be given, one's land is at the disposal of any person conveying it as agent, *without* authority. The evidence of his power is the letter of attorney. That is recorded, and thus preserved and made accessible, because it is an indispensable instrument of evidence, preliminary to the introduction of the deed.

The letter of attorney and deed being offered, the defendant objected that the grantors were trustees under articles already in evidence which contain no authority to convey, and particularly by agent, and cited 4 Johns. Ch. R. 368; 1 McLean R. 199.

BY THE COURT. The cases cited are not in point—not cases of title held in trust, but of powers to sell land of which the legal title was in others,—mere agencies. These articles of association authorized the trustees to possess themselves

of the legal title, which they did by the judgment of partition, if not before, and also to sell a limited quantity, and divide the residue. This conveyance is not *prima facie* a breach of trust, and, if it were, a court of law would hardly notice it. With the legal title resides the power of alienation, and, at law, alienation *sui juris*, which includes the power of appointing an agent.

The plaintiff having read the deed, offered the will of the grantee, devising to him the land. The defendant objected that the record proved it to have been admitted to probate on the testimony of one witness.

By THE COURT. Only that which gives the court jurisdiction of the case need be averred in the record to support the judgment or decision. When the court appears to have had jurisdiction, its acts done in the *exercise* of that jurisdiction are presumed to be correct, and if the contrary expressly appears it is but error. And this rule is universal as to all *judicial* acts, whatever *dicta* or *decisions* may be found to the contrary, and that without regard to the character of the tribunal whose record it is, whether it have jurisdiction generally of all matters not prohibited, or specially of only those expressly given.

The probate court is of limited jurisdiction in respect to the number and kind of subject matters upon which it may act. But its powers are judicial and plenary over those subjects, though they are *regulated*, as to the mode, by statute. This record is of the probate of a will,—a matter clearly within its jurisdiction,—and stands on the same footing, jurisdiction appearing, as the records of this or any other court. It must therefore be presumed that the heirs assented, or that one witness was dead or absent, so that a single witness filled the statute. But if these facts were expressly negatived by the record, it would only prove that the court ought to have decided the other way, not that it lacked the power of deciding.

The defendant read the will, and proved the defendant in possession of the land, and rested.

The defendant offered to prove title in himself, derived from a half-breed, and actual possession under that title from before the partition to the present time, and that the partition was fraudulently obtained, without the proof of title required by the statute; to which the plaintiff objected.

BY THE COURT. If there was fraud, it was the fraud of the court in making a false record, for the record avers the fact now denied, or the fraud of the parties in imposing false proof upon the court. In whatever it may consist, is it admissible in evidence in this suit, to defeat the plaintiff's title, derived through the fraudulent judgment? Could it be admitted even against a party to the fraud? 8 Ohio R. 108; 22 Maine R. 130. Not in this state, certainly, since *Webster* v. *Reid*, Morris 467. Even on a bill in chancery for the express purpose, giving the party accused the right of explanation or denial, notice of the fraud must be brought home to all the subsequent purchasers. This is not proposed; therefore, if the fraud could be inquired of, it could not affect the plaintiff's title.

The court charged the jury that the judgment of partition, and the deed and will, prove title in the plaintiff.

VERDICT FOR PLAINTIFF.